UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUFUS THOMAS,

      Petitioner,

v.

KRIS TASKILA[1], *Warden*,

      Respondent.

Case No. 19-13705
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS [13] AND SUBSTITUTING
RESPONDENT**

---

Rufus Thomas was criminally charged for two shootings that occurred at or near a Detroit marijuana dispensary. An employee of the dispensary, Joshua Colson, was injured during the first shooting on October 6, 2015. And another employee, Frank Semma, was killed during the second shooting on October 21, 2015. Thomas was tried by a jury and ultimately convicted.

After raising various claims before the Michigan state courts, Thomas now asks this Court to grant him a writ of habeas corpus. (ECF No. 13.) For the reasons that follow, Thomas' petition is denied.

**I.**

The Michigan Court of Appeals provided an extensive factual summary of Thomas' trial when considering his direct appeal. *See People v. Thomas*, No. 33760,

---

[1] The Court substitutes Kris Taskila for Daniel Lesatz, as Taskila is the warden of the facility where Thomas is incarcerated.

2018 WL 4165246, at *1–6 (Mich. Ct. App. August 30, 2018). The Court provides pieces of this summary here for background before it considers Thomas' claims.

As mentioned, Thomas' convictions arose from two shootings of employees of Total Relief Dispensary in Detroit. Eyewitness testimony described the first shooting as follows:

> Jonathan Rowsey testified that at approximately 10:00 a.m. on October 6, 2016, he was standing outside his automobile collision shop, Advance Expert Collision, which is located across the street from Total Relief Dispensary. He saw a silver station wagon, with three men inside, parked in front of Aunt Betty's Restaurant, which is located next to Advance Expert Collision. [Joshua] Colson, who was a manager at Total Relief Dispensary, testified that he was at the dispensary that morning. At approximately 10:00 a.m., he went outside to "smoke a cigarette or get fresh air." Rowsey testified that as Colson was walking back to the dispensary from his vehicle, the silver station wagon "hit a U-turn and stopped in front of the dispensary and started shooting." . . . Colson testified that he saw a silver four-door vehicle approach and stop in the middle of the street. He then "felt and heard" gunshots, and he was shot multiple times. Colson saw at least three men in the vehicle. . . . [Total Relief's security guard] Williams also described the vehicle during his trial testimony as a gray station wagon[.]

*Thomas*, 2018 WL 4165246, at *1.

The second shooting occurred a couple of weeks later: "At approximately 9:20 p.m. on October 21, 2015, Semma, who also worked at Total Relief Dispensary, was found dead inside his 2015 GMC Sierra pickup truck at the intersection of Grand River Avenue and Burt Road, approximately .7 miles away from the dispensary."

*Thomas*, 2018 WL 4165246, at *2. From surveillance footage

> that night at approximately 9:10 p.m. a silver SUV can be seen, after having remained parked near the collision shop during the previous hour, turning its headlights on and driving away about one or two seconds after another vehicle that had been parked started driving. There was further testimony that additional surveillance video was

> retrieved from Grand River Collision on Grand River Avenue, which showed Semma's black pickup truck driving down Grand River Avenue at approximately 9:12 p.m that night, followed by a silver or light-colored SUV. [Michigan State Police Detective Sergeant] Walton testified that this silver SUV was the same one she saw parked for an hour [at the collision shop]. According to Walton, the silver SUV shown in the surveillance videos was identified as a Chevrolet Trailblazer SS[.]

*Id.*

Evidence connected Thomas to these two shootings in a few ways. Start with the vehicles used in each—a silver station wagon and a Chevrolet Trailblazer SS. "Officers were able to identify the silver station wagon that was depicted in the surveillance video as a Volvo V60, and as a result, Walton and her team checked for reports of stolen Volvos." *Thomas*, 2018 WL 4165246, at *2. That led them to Ashira Marshall who "knew [Thomas] through her boyfriend[.]" *Id.*

> On October 1, 2015, Marshall rented a silver 2015 Volvo V60 station wagon, and she brought the Volvo to the house on Holcomb on October 4 or 5, 2015. She spent the night there on October 5, 2015. Defendant . . . [was] also there that night. Marshall testified that defendant left at some point and never returned to the house that night. She realized the Volvo was gone at approximately 2:00 a.m. or 3:00 a.m. Marshall called defendant's cell phone, but he did not answer. Marshall went to the police the next day to report the vehicle stolen[.]

*Id.* at *3. On a cellphone connected to Thomas, Michigan State Police Sergeant Boike found

> a YouTube search for a 2015 Volvo V60 at 2:22 p.m. on October 6, 2015, and there was a web search for a 2015 Volvo V60 on October 26, 2015. There was also a web search on October 6, 2015, for "How to remove a GPS disabler from a vehicle." . . . Boike was also able to recover photographs from the cell phone attributed to defendant. A photograph on the phone that was dated October 6, 2015, at 9:47 a.m., showed what was identified at trial as the inside of a 2015 Volvo V60 by Michael Path, who testified as an expert in Volvos and Volvo features.

*Id.* at *5.

3

As for the Trailblazer SS, Thomas was pulled over in the same make and model of car by Detroit Police. *Id.* at *3. Witnesses testified that Thomas had been driving the car for "maybe a week" before his arrest on October 29. *Id.* The cellphone discussed above was also found in the Trailblazer SS, which Thomas identified as his at the scene. *Id.* Officers found an Instagram account attributed to Thomas via the cellphone, which showed a photograph from October 23 depicting "a steering wheel with an 'SS' in the center[.]" *Id.* at *5.

Now to the weapons used in each shooting.

> On January 3, 2016, police recovered a firearm believed to have been used in the October 6, 2015 shooting. Detroit Police Officer Thomas Houston testified that while on patrol at approximately 12:15 a.m. on January 3, 2016, he passed 12201 Morang and saw three men standing on the grass who took off running toward the apartment complex as Houston's vehicle drove past. Houston and his partner stopped, got out of their vehicle, and chased the three men to the doorway of one of the apartment units. They detained all three men, who were subsequently identified as John Lamb, Joseph Lamb, and defendant. . . . Houston testified that he and his partner also found a .40 caliber handgun, which contained 19 live rounds, on the grass in the area where John, Joseph, and defendant had been running. . . .[Donna Lamb, mother of Joseph Lamb] testified that after the police left [12201 Morang], she asked defendant why he kicked her door in, and he said that he had to "throw a gun." Michigan State Police Detective Lieutenant Brian Bergeron, testifying as an expert in firearm and tool mark identification, opined that the .40 caliber shell casings recovered from the scene of the October 6, 2015 shooting were fired by the .40 caliber handgun recovered outside 12201 Morang on January 3, 2016.

*Id.* at *3. The firearm used in the October 21 shooting was recovered from the same Holcomb house where, according to Marshall, she had hung out with Thomas before her Volvo went missing. *Id.* at *4.

4

Testimony about Thomas' cell-site data also placed him in the relevant areas at the relevant times:

> The records showed that [Thomas'] cell phone made calls [on October 6, 2015] at approximately 9:37 a.m. and 9:52 a.m. from the area in which Total Relief Dispensary was located. The records also showed that approximately 15 minutes after 911 had been called with respect to the shooting, the cell phone associated with defendant made calls from which McGinnis could determine that the phone was in the area of 5444 Holcomb. McGinnis also generated a call report and cell site maps for October 21, 2015, which showed that at 9:13 p.m., approximately nine minutes before the 911 call related to the shooting, defendant's phone was in the area of Grand River Avenue near the scene of the shooting. Approximately eight minutes after the 911 call, the cell phone associated with defendant was in the area of 5444 Holcomb.

*Id.* at *6.

Apart from the evidence linking Thomas to the two shootings, the prosecution also provided the jury with a motive. The jury heard evidence that there was a dispute between a previous co-owner of the dispensary and the current owners. *Id.* at *2. The prosecution also presented text message evidence between Thomas and his then-girlfriend that demonstrated that Thomas needed money.

> On October 4, 2015, there was a text message conversation with "LOML MY" about getting money for food and in which the user of the phone wrote, "I swear baby I'm really trying to get us some serious paper." On October 4, 2015, another outgoing message to "Ralf" said, "We can do that situation ourselves, Bro', if yo' girl gonna be transportation and me and you will split the if [sic] you still down, Bro'. We need this shit Bro'." Another October 4 outgoing message to "Bro' Big" said, "Need to use that M4, Bro'. I'mma just pull up on them. Shit too structured talk to them in front of that place." Another outgoing message to Bro' Big that day said, "Simple quick and easy."

*Id.* at *5. Thomas' cellphone also revealed several communications with a contact named "Murder C." *Id.* "On October 2, 2015, an incoming text message from Murder C said, 'Are we still on tht [sic] mission?' In response, an outgoing message from

5

[Thomas' phone] said, 'Hell, yeah.'" *Id.* And there is a photo from October 23 on Thomas' Instagram, which "showed a large bundle of United States currency." *Id.* So the prosecution presented a murder-for-hire theory where Thomas (and perhaps Murder C) were hired by the former co-owner of the dispensary to commit the shootings for pay.

Following his conviction, Thomas appealed to the Michigan Court of Appeals, raising two claims: one, that the trial court erred in not severing his case into two trials, or alternatively, that his counsel was ineffective by failing to raise the issue until a few days before trial; and two, that there was insufficient evidence for his conviction to stand. The Michigan Court of Appeals affirmed the conviction. *People v. Thomas*, No. 33760, 2018 WL 4165246, at *1–6 (Mich. Ct. App. August 30, 2018). Thomas filed an application for leave to appeal to the Michigan Supreme Court raising the same two claims. The Michigan Supreme Court denied the application by form order. *People v. Thomas*, 922 N.W.2d 112 (Mich. 2019) (Table).

That led Thomas to this Court, where he asked for a writ of habeas corpus on the same two grounds. (ECF No. 1.) However, shortly after filing his petition, Thomas returned to the state trial court to raise new claims in a motion for relief from judgment under Michigan Court Rule 6.500. (ECF No. 17-2.) The trial court denied the motion on the merits. (ECF No. 17-4.)

Though Thomas went on to appeal the denial of his motion for relief from judgment to both the Michigan Court of Appeals and the Michigan Supreme Court, each appeal raised different claims compared both to his original motion and to each

6

other. Both appeals were summarily denied. (ECF No. 17-6, PageID.2871 (denying leave to appeal to the Michigan Court of Appeals "because defendant has failed to establish that the trial court erred in denying the motion for relief from judgment"); ECF No. 17-7, PageID.3022 (denying leave to appeal to the Michigan Supreme Court because "the defendant has failed to meet the burden of establishing entitlement to relief under Mich. Ct. R. 6.508(D)").)

Eventually, Thomas filed an amended petition with this Court, which raises numerous grounds for habeas relief. (ECF No. 13.) For the reasons that follow, the Court will deny the petition.

## II.

Before the Court turns to the merits of Thomas' claims, it first considers the Warden's argument that Thomas has not exhausted all of the claims he presented in his amended petition. *See Wagner v. Smith*, 581 F.3d 410, 415 (6th Cir. 2009) ("Although the exhaustion doctrine is not a jurisdictional matter, it is a threshold question that must be resolved before we reach the merits of any claim.").

A petitioner seeking a writ of habeas corpus under 28 U.S.C. § 2254 must generally exhaust all state remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Exhaustion provides state courts the "opportunity to address alleged flaws in their criminal procedures." *Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005). To satisfy this requirement in Michigan, a petitioner must first raise the issues he presented in his habeas petition to both the Michigan Court of Appeals and the Michigan Supreme Court. *See Wagner*, 581 F.3d at 414.

Typically, exhaustion also requires that the claim be fairly presented to the state trial court before being appealed to the state court of appeals and state supreme court.[2] *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary 'opportunity' [to correct alleged violations of its prisoners' federal rights] the prisoner must 'fairly present' his claim in each appropriate state court[.]"); *Blackshere v. Maclaren*, No. 15-904, 2016 WL 561521, at *4 (6th Cir. Feb. 9, 2016) (affirming district court finding that a claim was not exhausted because it was presented for the first time in a motion for leave to appeal a Rule 6.500 motion); *Theriot v. Vashaw*, 982 F.3d 999, 1003–04 (6th Cir. 2020) (finding procedural default where petitioner did not comply with Michigan rules providing that "issues that are not properly raised before a trial court cannot be raised on appeal absent compelling or extraordinary circumstances" (quoting *People v. Cain*, 869 N.W.2d 829, 832 (2015))). So Thomas must have presented his habeas claims at all three levels of the Michigan court system in order to have exhausted them.

As mentioned, Thomas raised new claims in his appeals to the Michigan Court of Appeals and the Michigan Supreme Court and failed to appeal claims that he had raised in his initial motion for relief from judgment. Focusing on just the claims Thomas raised in his amended petition before this Court, the following chart summarizes when Thomas raised each claim. The claims raised at all three levels of the Michigan state courts are bolded in the first column:

---

[2] There may be a narrow exception for a new claim that was raised on appeal and actually considered by the appellate court under its discretionary-review power, but that is not the case here. *See Castille v. Peoples*, 489 U.S. 346, 351 (1998).

| Habeas Claim in Amended Petition (ECF No. 13) | Direct Appeal | Direct Appeal MSC | Post-Conviction | Post-Conviction MCOA | Post-Conviction MSC |
|---|---|---|---|---|---|
| **I. Sufficiency of the Evidence** | ECF 11-21, PageID.1868 | ECF 11-22, PageID.1934 | ECF 17-3, Page ID.2732 | | |
| **II. Improper Joinder of Charges and related IAC claim** | ECF 11-21, PageID.1868 | ECF 11-12, PageID.1934 | ECF No. 17-3, PageID.2799 (IAC claim) | | |
| **III. Prosecutorial Misconduct** | | | | | |
| (1) *Brady* – Lambs caught with guns | | | | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3060 |
| (2) *Brady* – Lamb arrested by FBI | | | | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3060 |
| (3) *Brady* – Lamb's statement | | | | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3060 |
| (4) *Brady* – Lamb given leniency | | | | | ECF No. 17-7, PageID.3060 |
| **(5) Perjury—No evidence of murder for hire offered** | | | ECF No. 17-3, PageID.2786 | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3062 |
| **(6) Fabricated Testimony – 7 items** | | | ECF 17-3, PageID.2784–2788 | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3062–3063. |
| **(7) Presumption of innocence – Comment on Thomas' t-shirt** | | | ECF No.17-3, PageID.2786 | ECF No. 17-6, PageID.2900–2902 | ECF No. 17-7, PageID.3064 |
| (8) Bias – dating crooked officer | | | | | ECF No. 17-7, PageID.3065 |
| IV. Admission of Other Acts Evidence | | | | ECF No. 17-6, PageID.2903 | ECF No. 17-7, PageID.3067 |
| V. Right to Present Defense – George's Invocation of Fifth Amendment | | | | ECF No. 17-6, PageID.2908 | ECF No. 17-7, PageID.3072 |
| **VI. Right to Present a Defense – Exclusion of** | | | In context of sufficiency-of-evidence claim (ECF No. 17-3, | ECF No. 17-6, PageID.2912 | ECF No. 17-7, PageID.3072 |

| | | | | | |
|---|---|---|---|---|---|
| **Barber's Confession** | | | PageID.2757.) | | |
| **VII. Illegal Search of Cell Phones** | | | ECF 17-3, PageID.2791–2793 | ECF No. 17-6, PageID.2915 | ECF No, 17-7, PageID.3077 |
| VIII. Speedy Trial Violation | | | | ECF No. 17-6, PageID.2919 | |
| IX. Failure to Administer Jury Oath | | | ECF 17-3, PageID.2779 | ECF No. 17-6, PageID.2923 | |
| X. Erroneous Flight Jury Instruction | | | | ECF No. 17-6, PageID.2928 | ECF No. 17-7, PageID.3082 |
| **XI. IAC – Trial Counsel** | | | | | |
| (1) Failure to Prepare | | | | | ECF No. 17-7, PageID.3085 |
| (2) Speedy Trial | | | | ECF No. 17-6, PageID.2932 | ECF No. 17-7, PageID.3085 |
| **(3) Prosecutorial Misconduct** | | | ECF No. 17-3, PageID.2798 | ECF No. 17-6, PageID.2933–2934 | ECF No. 17-7, PageID.3085 |
| **(4) Jury Oath Error** | | | ECF No. 17-3, PageID.2799 | ECF No. 17-6, PageID.2923 | ECF No. 17-7, PageID.3085 |
| (5) Other-Acts Evidence | | | | | ECF No. 17-7, PageID.3085 |
| (6) Illegal Search of Cellphones | | | | ECF No. 17-6, PageID.2933 | ECF No. 17-7, PageID.3085 |
| (7) Argument Regarding T-Shirt | | | | | ECF No. 17-7, PageID.3085 |
| **XII. IAC – Appellate Counsel** | | | | | |
| **(1) Fail to Raise Issues on Direct Appeal** | | | ECF No. 17-3, PageID.2800 | ECF No. 17-6, PageID.2937 | ECF No. 17-7, PageID.3101 |
| (2) Fail to provide complete record | | | | ECF No. 17-6, PageID.2937 | ECF No. 17-7, PageID.3101. |

Thus, the non-bolded claims that Thomas failed to present to the Michigan trial court, Michigan Court of Appeals, and Michigan Supreme Court are not exhausted.

And more importantly, these claims have been procedurally defaulted because Thomas can no longer exhaust them, meaning that this Court cannot review them.

*See Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."). In other words, Thomas has no remaining procedural vehicle to present his claims to the Michigan state courts. He has already filed a direct appeal and his one allotted motion for relief from judgment. *See* Mich. Ct. R. 6.502(G)(1). And his claims do not involve any of the exceptions that would allow him to file a second motion for relief from judgment. *See* Mich. Ct. R. 6.502(G)(2). So the Court may not consider these claims here.

Thomas may avoid the procedural default only if he can show that "there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *See Kissner v. Palmer*, 826 F.3d 898, 904 (6th Cir. 2016).

Thomas' argument that his appellate counsel performed deficiently could be construed as an argument that he has cause for failing to exhaust some of his claims. (*See, e.g.*, ECF No. 13, PageID.2156 ("An effective and reasonable attorney would not have chosen to abandon the issues in this case and surely would have investigated all of the facts before proceeding to file Defendant[']s appeal[.]").) But it only gets him so far. As the Sixth Circuit noted in *Kissner*, "the default occurred in his first post-conviction proceeding and had nothing to do with his appeal." 826 F.3d at 905. In other words, even if his appellate counsel on direct review acted deficiently by not raising more issues, Thomas still had the opportunity to correct the deficiency on collateral review where he was acting pro se. *See id.* ("In order to establish cause, a

habeas corpus petitioner must show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." (quoting *Murray v. Carrier*, 477 U.S. 478, 488, (1986))). Indeed, Thomas did raise these claims at some point during his collateral-review proceedings, but not at every level. And he provides no explanation as to why he raised different issues to different courts. So the Court will not excuse the procedural default for cause.

For the miscarriage-of-justice exception to apply, Thomas must "present new reliable evidence showing that he is actually innocent." *See Dufresne v. Palmer*, 876 F.3d 248, 256 (6th Cir. 2017) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). Though Thomas asserts his innocence, he does not present any new evidence in support of his claim. (*See* ECF No. 13, PageID.2061.) His arguments are based on testimony or exhibits from his trial, none of which could be considered "new" evidence. So the Court does not find that there will be a miscarriage of justice as a result of the procedural default.

*     *     *

In sum, many of the claims Thomas raised in his amended petition were not raised before all three levels of the Michigan courts. Thus, Thomas has not exhausted these claims. And because Thomas has no other way in which he can present these claims to the state courts, he has procedurally default them. He has failed to demonstrate cause and prejudice, or his actual innocence, to excuse the default.

So the Court will only address the following claims on the merits: (1) improper joinder (and the related ineffective-assistance-of-counsel claim); (2) insufficiency of

12

the evidence; (3) prosecutorial misconduct for not providing evidence for the "murder for hire" theory and for fabricating evidence; (4) the exclusion of Barber's confession; (5) admitting evidence from an unconstitutional search of cellphones; (6) ineffective assistance of trial counsel for failing to raise prosecutorial misconduct and jury oath issues; and (7) ineffective assistance of appellate counsel for failing to raise issues on direct appeal.

### III.

When considering habeas claims on the merits, federal courts must afford state-court decisions on the same issues considerable weight. The Antiterrorism and Effective Death Penalty Act ("AEDPA") (and 28 U.S.C. § 2254 in particular) "confirm[s] that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). So to obtain relief in federal court, habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' [must] show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). And "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as

13

'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. 86, 101 (2011). But if the state courts did not adjudicate a claim "on the merits," "AEDPA . . . does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### A. Improper Joinder of Charges

The Court starts with Thomas' argument that the trial court erred in denying his motion to sever the assault and first-degree murder charges against him. In the alternative, he argues that his trial counsel was constitutionally deficient in filing the motion for severance just three days before trial.

### 1. Motion to Sever

Since § 2254(d) applies to Thomas' claim, the Court must determine whether the Michigan Court of Appeals' decision[3] on Thomas' misjoinder claim was unreasonable based on relevant Supreme Court holdings at the time.

Thomas' claim fails at the outset because no clearly established Supreme Court law states that misjoinder of criminal charges violates the Constitution. In *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986), the Supreme Court suggested that misjoinder could rise "to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. But the Sixth Circuit has found that this language in *Lane* is dicta and does not

---

[3] Because the Michigan Supreme Court denied leave to appeal (ECF No. 11-22, PageID.1932), the Michigan Court of Appeals' decision on direct appeal is the "last related state-court decision that . . . provide[s] a relevant rationale." *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). So the Court will decide whether the Court of Appeals' decision complied with § 2254(d).

constitute clearly established law under § 2254(d). *See Mayfield v. Morrow*, 528 F. App'x 538, 541–42 (6th Cir. 2013) ("Thus, as to Mayfield's severance claim, *Lane* does not clearly establish anything." (citing *Carey v. Musladin*, 549 U.S. 70, 74 (2006)); *see also Parsley v. Skipper*, No. 20-2003, 2021 WL 1502725, at *3 (6th Cir. 2021) ("There is no clearly established federal law holding that a denial of a motion to sever can violate the Constitution."). This dooms the improper joinder claim.

And Thomas' citations to the Michigan Court Rules or Michigan case law do not save his argument. Errors of state law are not proper bases for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

So Thomas' improper claim does not warrant habeas relief. *See* 28 U.S.C. § 2254(d).

### 2. Ineffective Assistance of Counsel

The Michigan Court of Appeals also evaluated Thomas' claim that his trial counsel was constitutionally deficient in moving for severance just three days before trial was to begin. It concluded that "an earlier motion would have been futile, and trial counsel is not ineffective for failing to make a futile motion." (ECF No. 11-21, PageID.1817.)

To prove ineffective assistance of counsel, a petitioner must show constitutionally deficient performance and prejudice. *See Strickland v. Washington*, 474 U.S. 668 (1984). In this context, prejudice means "a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Strickland*, 474 U.S. at 694).

So "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Emerick v. Prelesnik*, 491 F. App'x 639, 647 (6th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

The Michigan Court of Appeals found that the trial court was not obligated to sever the charges because they were "related." (ECF No. 11-21, PageID.1817.) The court further explained that severance was not warranted "in the interest of fairness" because of the "large degree of overlapping proof in this case . . . necessary to sufficiently establish defendant's identity as a participant in each shooting. Considering the nature of the evidence required to prove identity and the high degree of intertwinement of the connections between people, places, and vehicles that were associated with both shootings, the relevant factors weighed against severance." (*Id.*)

The Court finds that this decision was not contrary to or an unreasonable application of federal law. As an initial matter, the Sixth Circuit has found that "[t]here is no clearly established federal law holding that a denial of a motion to sever can violate the Constitution." *See Parsley v. Skipper*, No. 20-2003, 2021 WL 1502725, at *3 (6th Cir. Feb. 17. 2021) (citing *Mayfield v. Morrow*, 528 F. App'x 538, 541–42 (6th Cir. 2013)). So it is unlikely that a delay in moving to sever would be contrary to or unreasonable under federal law when there is no substantive federal right to severance in the first instance. Thomas also provides no federal case law which

establishes that filing a delayed or untimely motion to sever is constitutionally deficient performance under *Strickland*. So the Court will not grant the writ on the basis of Thomas' ineffective-assistance-of-counsel claim.

## B. Sufficiency of the Evidence

Next is Thomas' sufficiency-of-the-evidence claim. The Supreme Court has held "that the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a petitioner, like Thomas, challenges the sufficiency of the evidence underlying his conviction, the Court must view the trial testimony and exhibits "in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009); *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (internal quotations omitted).

On habeas review, Thomas faces an even steeper hurdle. "[T]he law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [appellate court's] consideration of the trier-of-fact's verdict, as dictated by

AEDPA." *Id.* (citations omitted). In other words, it must be the case that the Michigan Court of Appeals' decision on this claim is contrary to or an unreasonable application of *Jackson v. Virginia.*

Thomas only challenges whether there was sufficient evidence that he was the perpetrator of the charged crimes. "The identity of a defendant as the perpetrator of the crimes charged is an element of the offense [of premeditated murder] and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 181 N.W.2d 655, 656 (Mich. Ct. App. 1970)).

Thomas is correct that no direct evidence linked him to either shooting. (*See* ECF No. 1, PageID.42.) But the circumstantial evidence in this case—including cell-site data, inculpatory text messages, and evidence connecting Thomas to the vehicles and weapons involved in the crimes—made it reasonable for the Court of Appeals to conclude that there was sufficient evidence that Thomas was the perpetrator. *See People v. Fletcher*, 679 N.W.2d 127, 145 (Mich. Ct. App. 2004) (holding that circumstantial evidence can provide evidence of identity and intent); *People v. Unger*, 749 N.W.2d 272, 286 (Mich. Ct. App. 2008); *Jackson*, 443 U.S. at 324–25 (considering circumstantial evidence).

Start with the evidence from the cellphone. Thomas was arrested for an unrelated traffic violation, and a cellphone was found in the floorboard of the car. Thomas told officers, "that's my phone." (ECF No. 11-15, PageID.1176 (Trial Tr. at 174–175 (Feb. 7, 2017)).) On that phone, there was a Google account with the name Thomas Rudie and an Instagram account with the name Rudie. (ECF No. 11-16,

PageID.1397 (Trial Tr. at 140 (Feb. 8, 2017)).) Text messages on the phone also identified the sender as "Rudie." (*Id.* at PageID.140 (Trial Tr. at 153 (Feb. 8, 2017)).) Rudie is Thomas' middle name, and witnesses confirmed that Thomas went by Rudie. (*See* ECF No. 11-16, PageID.1324, 1370–1371 (Trial Tr. at 67, 113–114 (Feb. 8, 2017)).) There was also testimony that there were photos of Thomas on the phone. (ECF No. 11-17, PageID.1505–1506 (Trial Tr. at 47–48 (Feb. 9, 2017)).) So it was reasonable for the state court to conclude that a jury could infer from this evidence that this cellphone and the related accounts were owned by Thomas.

And that phone provided a link between Thomas and the crime scenes. Detective McGinnis testified that the cell-tower data placed the cellphone "at the scene . . . [on October 6, 2015] at the time of the non-fatal shooting or at least 10 minutes prior to" and in the vicinity of the October 21, 2015 shooting around 9 minutes prior to the shooting. (ECF No. 11-17, PageID.1588, 1594–1595 (Trial Tr. at 130, 136–137 (Feb. 9, 2017)).) So it was also reasonable for the Court of Appeals to find that a jury, looking at this evidence in the light most favorable to the prosecution, placed Thomas in the vicinity of the two shootings as they were occurring.

There was also circumstantial evidence of a possible motive for Thomas to commit these shootings. Recall that both shootings were related to Total Relief Dispensary. The prosecution's theory was that Thomas was hired to target the dispensary by its previous owner. On October 2, a few days before the first shooting, Thomas' phone received a text message from a contact named "C Murder." (ECF No. 11-16, PageID.1410 (Trial Tr. at 153 (Feb. 8, 2017)).) This phone number was later

linked to Christian Brown, who was arrested separately from Thomas. C Murder wrote, "Are we still on t-h-t mission?" (ECF No. 11-16, PageID.1410 (Trial Tr. at 153 (Feb. 8, 2017)).) Thomas responded, "Hell, yeah." (*Id.*) Two days later, Thomas sent a text message to his then-girlfriend saying, "I'm really trying to get us some serious paper." (ECF No. 11-16, PageID.1414 (Trial Tr. at 157 (February 8, 2017)).) This was in the context of an argument apparently about not having enough food to eat. (*Id.* at PageID.1412–1413 (Trial Tr. at 155–156 (February 8, 2017)).) Later, on October 25, just a couple of days after the second shooting, a photo was posted on the Instagram page associated with Thomas with the caption "#shooters." The image is of a masked individual and "C Murder." (ECF No. 11-17, PageID.1646–1647 (Trial Tr. at 188–189 (Feb. 9, 2017)).) On October 26, a photo was taken on the phone of a "large bundle of what appears to be U.S. currency." (ECF No. 11-16, PageID.1408 (Trial Tr. at 151 (February 8, 2017)).) Thus, a jury could have inferred from this evidence that Thomas needed money, had a plan with "C Murder" to commit these shootings, and after they completed their "mission," they were rewarded in cash.

The state court also reasonably concluded that the jury could have found that Thomas was connected to the vehicles that were used in each shooting. For the October 21 homicide, Walton, the investigating officer, testified that the surveillance video from Total Relief Dispensary showed a Trailblazer SS sitting outside the dispensary for an hour before the shooting, and then following Semma's pickup truck shortly before he was shot. (ECF No. 11-17, PageID.1630 (Trial Tr. at 172 (Feb. 9, 2017)).) Just before Thomas was arrested, the police pulled him over in a Trailblazer

SS. (ECF No. 11-15, PageID.1170, 1174 (Trial Tr. at 169, 173 (Feb. 7, 2017)).) Thomas' ex-girlfriend (who is also Christian Brown's sister) testified that Thomas had been driving a SS Trailblazer. (ECF No. 11-17, PageID.1480, 1481 (Trial Tr. at 22, 23 (Feb. 9, 2017)).) And Brown's cellphone had a video on it from October 21, just a few minutes before the shooting, that depicted Thomas behind the wheel of an SS Trailblazer. (ECF No. 11-16, PageID.1273–1274 (Trial Tr. at 16–17 (Feb. 8, 2017)).) Physical evidence also linked Thomas to the Trailblazer, as his fingerprints were found on items recovered from that vehicle. (ECF No. 11-16, PageID.1337–1349 (Trial Tr. at 80–92 (Feb. 8, 2017)).) So there was evidence from which a jury could have concluded that Thomas drove a Trailblazer SS and that a Trailblazer SS was used in the shooting.

There was also evidence connecting Thomas to a 2015 Volvo, which was connected to the October 6 shooting. More specifically, the perpetrators in that shooting were in a 2015 Volvo V60. (ECF No. 11-15, PageID.1022 (Trial Tr. at 21 (Feb. 7, 2017)) (expert identifying car in video to be a 2015 Volvo V60).) Thomas' phone had a photo taken minutes before the shooting that showed, according to a Volvo expert, the interior of a 2015 Volvo V60. (ECF No. 11-16, PageID.1408–09 (Trial Tr. at 151–152 (Feb. 8, 2017)).) And there was also some evidence that Thomas had stolen a 2015 Volvo V60 from Ashira Marshall, who was the girlfriend of one of Thomas' friends. She testified that she had rented the Volvo and that one night after Thomas had left her house, the vehicle went missing. (ECF No. 11-15, PageID.1033–1040 (Trial Tr. 32–39 (Feb. 7, 2017)).) And Michigan State Police Sergeant David

Boike testified that he found search results on Thomas' cellphone for instructions on how to disable the GPS tracker from a Volvo and photographs of Thomas in the same model of Volvo the day after Thomas visited a house where Marshall was staying. (*See* ECF No. 11-16, PageID.1420 (Trial Tr. at 163 (Feb. 8, 2017)).)

Further, Brown's cellphone contained a number of photos of Total Relief Dispensary, including one photo of the dispensary with Thomas also in it. (ECF No. 11-17, PageID.1513 (Trial Tr. at 55 (Feb. 9, 2017)).)

The prosecution also presented evidence that Thomas was in the same areas where the weapons used in the shootings were found. For instance, Thomas had an encounter with Detroit police in January 2016, when officers witnessed him running toward a house with two other men while the officers patrolled the area. Officers found a handgun near the lawn of the house where the men were apprehended. (ECF No. 11-16, PageID.1292–1295 (Trial Tr. 35–38 (Feb. 8, 2017)).) The owner of the house, Donna Lamb, testified that Thomas told her that he had thrown a gun by her house that same day. (*Id.* at PageID.1327 (Trial Tr. at 70 (Feb. 8, 2017)).) Expert testimony established that the casings found at Total Relief Dispensary (from the October 6 shooting) came from the gun found near the house. (ECF No. 11-17, PageID.1551 (Trial Tr. at 93 (Feb. 9, 2017)).) As for the weapon used during the October 21 shooting, it was discovered at a house where Thomas often stayed, including the night before Marshall's Volvo went missing from that same house, and where his cellphone data showed he fled to immediately after the second shooting. (ECF No. 11-15, PageID.1031 (Trial Tr. at 30 (Feb. 7, 2017)); ECF No. 11-17,

PageID.1557, 1589 (Trial Tr. at 99, 131 (Feb. 9, 2017)); ECF No. 11-16, PageID.1435–1436 (Trial Tr. at 178–179 (Feb. 8, 2017)).)

Considering all of this evidence, the Court of Appeals did not unreasonably apply *Jackson v. Virginia* in concluding that there was sufficient evidence for the jury to find that Thomas committed the shootings on October 6 and October 21. So the Court will not grant Thomas' petition on his sufficiency-of-the-evidence claim.

### C. Prosecutorial Misconduct

Thomas raises a number of issues with the prosecutor's conduct during his trial, most of which boil down to the prosecutor either "fabricating evidence" or making improper inferences or conclusions from the evidence to the jury. His claims include: (1) improperly using Ashira Marshall's testimony to argue that Thomas stole her Volvo before the first shooting, (2) fabricating evidence that Thomas photographed himself in Marshall's car shortly before the first shooting, (3) presenting a murder-for-hire theory without supporting evidence, (4) fabricating forensic cellphone-location evidence, (5) fabricating evidence that Thomas was seen in a truck on surveillance video, (6) fabricating evidence that Thomas placed the second murder weapon under Lamb's bed, (7) improperly arguing that Thomas admitted participation in the murder by using "#shooters" on an Instagram post, and (8) improperly commenting on Thomas' t-shirt that states, "Your Worst Nightmare."

Thomas presented these allegations of misconduct in his motion for relief from judgment, which the trial court rejected on the merits. The trial court found that "there is no indication from the record that the prosecutor argue[d] facts not in

evidence. The record clearly demonstrates that the alleged fabricated claims are, in fact, the prosecutor drawing reasonable inferences from the evidence presented at trial." (ECF No. 17-4, Page.ID.2831–2832.)

This decision was neither contrary to, nor an unreasonable application of, Supreme Court law. A prosecutor's arguments must be "rooted in the evidence" and cannot rely on "facts that were never admitted into evidence[.]" *Stermer v. Warren*, 959 F.3d 704, 725 (6th Cir. 2020). And "[i]f a prosecutor's comments were improper, the question becomes whether they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting in part *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "To decide this question, 'the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [statement] would have on the jury's ability to judge the evidence fairly." *Id.* at 726 (quoting *United States v. Young*, 470 U.S. 1, 12 (1985)).

As a general matter, Thomas does not point to any specific statement by the prosecutor or cite to a particular portion of the record in his argument. So the Court addresses Thomas' claims only to the extent it can surmise which statements Thomas asserts are improper.

Start with Thomas' claim that the prosecutor misrepresented Marshall's testimony by arguing that Thomas stole Marshall's Volvo. (ECF No. 13, PageID.2099.) Marshall testified that she had rented the Volvo and that one night after Thomas had left her house, the vehicle went missing. (ECF No. 11-15,

24

PageID.1033–1040.) She reported it stolen. (*Id.*) As mentioned, Sergeant Boike testified that he found search results on Thomas' cellphone for instructions on how to disable the GPS tracker from a Volvo and photographs of Thomas in the same model of Volvo the day after Thomas visited Marshall's house. (*See* ECF No. 11-16, PageID.1420.) Taken together, this evidence allowed the prosecutor to draw an inference and argue that Thomas stole the vehicle. And the jury would have been able to judge the evidence in support of this inference fairly regardless of the prosecutor's statement.

Thomas also says that there is no evidence to support the prosecutor's statement that Thomas photographed himself in the same Volvo minutes before Colson was shot. (ECF No. 13, PageID.2099.) However, a photo was recovered from a phone tied to Thomas from the morning of the shooting that was identified by an expert to be of the inside of a 2015 Volvo. (ECF No. 11-16, PageID.1408–09 (Trial Tr. at 151–152)).) This evidence provided a basis for the prosecutor's statement.

Similarly, the prosecutor's arguments relating to Thomas' location during the shootings were based on expert testimony on the cell-tower data. In fact, Detective McGinnis testified that the cell-tower data placed the cellphone "at the scene . . . [on October 6, 2015] at the time of the non-fatal shooting or at least 10 minutes prior to" and in the vicinity of the October 21, 2015 shooting around 9 minutes prior to the shooting. (ECF No. 11-17, PageID.1588, 1594–1595 (Trial Tr. at 130, 136–137 (Feb. 9, 2017)).) Thomas argues that McGinnis also "contradicted" himself by saying that a phone can jump to different cell towers without ever leaving the same area. But that

does not contradict the prosecutor's inference—it just allows the defense to argue an opposing inference. So the prosecutor did not act improperly by arguing that Thomas was in the same area of the shootings at the time of the shootings.

Next, Thomas argues that the prosecutor fabricated the claim that this was a murder for hire because there was no evidence to support such a charge. The Court disagrees. First, there was testimony that the previous owners of the dispensary and the current owners had a dispute. (ECF No. 11-21, PageID.1807.) The jury also saw a photo on Thomas' Instagram showing large bundles of cash shortly after the two shootings took place. (ECF No. 11-21, PageID.1812.) And as described previously, there was plenty of evidence for the jury to connect Thomas to the shootings themselves. Putting this all together, the prosecutor had an evidentiary basis to argue that Thomas was paid to commit the shootings in furtherance of this feud between the dispensary's owners.

Thomas also argues that the prosecutor fabricated the fact that Thomas placed the gun connected to the second shooting in Lamb's house. But there were multiple facts that connected Thomas to the Lamb house, including that he was a frequent visitor and that his cell-tower data placed him at the Lamb house minutes after both shootings. (*See* ECF No. 11-21, PageID.1819.) Not to mention all the other evidence that connected Thomas to the second shooting, and thus, the gun used in that shooting. So it was reasonable for the prosecution to argue that Thomas was the one who hid the gun at the Lamb house, given his connections to the home and to the shooting.

Thomas also asserts prosecutorial misconduct based on "the claim that it appears Petitioner Thomas was in the truck seen on the video that the prosecutor asserted was used in the murder of Mr. Semma[.]" (ECF No. 13, PageID.2099.) It is not clear what truck Thomas is referring to or what statement the prosecutor made. In closing, the prosecutor stated: "This time there is also a GMC black pickup truck which is the kind of truck that Francis Semma was driving. And we have . . . video [of Thomas] driving by the dispensary with guns . . . [on] [t]he days of the murder . . . driving the SS." (ECF No. 11-19, PageID.1714 (Trial Tr. at 33 (February 13, 2017)).) Though not entirely clear, it seems that the prosecutor is referring to testimony that Brown's phone contained a video showing Thomas in a SS Trailblazer driving by the dispensary and also showing Semma's black pickup truck (perhaps in the background of the video). (*See, e.g.*, ECF No. 11-16, PageID.1270 (Trial Tr. at 13 (Feb. 8, 2017)).) The prosecutor did not say that Thomas was in the black pickup truck. So the prosecutor properly relied on video evidence when making her statement.

The prosecutor's comment that Thomas' use of "#shooters" in his Instagram post was an admission also did not amount to misconduct. (*See* ECF No. 11-19, PageID.1716.) Perhaps the Instagram caption alone would not justify the prosecutor arguing that Thomas had admitted he was a "shooter." But given all the evidence presented in this case that connected Thomas to the two shootings, the prosecutor did not act inappropriately by suggesting that Thomas' use of the hashtag was an admission. And even if such an inference was inappropriate, this one statement alone

did not amount to a denial of due process. *See Darden*, 477 U.S. at 182 ("[T]he overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges . . . reduced the likelihood that the jury's decision was influenced by argument.").

And finally, Thomas argues that the prosecutor "deprived Petitioner Thomas of his right to the presumption of innocence" by "referring to his clothing in a negative basis" because he was wearing a shirt in a photo that said, "Your Worst Nightmare." (ECF No. 13, PageID.2100.) Thomas explains that it was a Freddie Kruger shirt. (*Id.*) Again, Thomas does not identify what the prosecutor said about this shirt that would amount to misconduct. During her opening statement, the prosecutor showed a photo from Thomas' phone apparently depicting Thomas wearing a shirt with this phrase. (ECF No. 11-14, PageID.834.) But it appears that the prosecutor was using the shirt only to show that Thomas was wearing the same "distinctive" shirt in several photos before and after the shootings, including in the photo posted on Instagram with "#shooters." (ECF No. 11-14, PageID.834–835.) In other words, the prosecutor did not remark on the statement of the shirt other than to identify Thomas in various photos. So the Court will not grant relief on this claim either.

Accordingly, the state trial court's rejection of the prosecutorial-misconduct claim did not involve an unreasonable application of *Darden*.

### D. Exclusion of Barber's Confession

Thomas argues that the exclusion of Hugh Barber's confession resulted in a denial of due process.

According to medical records, Barber told a police officer and a doctor that while he was trying to break into a marijuana dispensary, he killed someone "on Grand River because the devil told me to." (ECF No. 11-18, PageID.1669.) He also said the person he shot was a "Chaldean guy" and that he threw the gun in a bush after. (*Id.*) The records also revealed that he arrived at a hospital under the influence of marijuana approximately four hours after the first shooting. (*Id.* at PageID.1670.)

Evaluating the statement under the Michigan Rules of Evidence and Michigan case law, the trial court excluded Barber's confession. (ECF No. 11-18.) It stated that under Michigan law, it was required to determine the trustworthiness of the statement based on "corroborating circumstances." (*Id.* at PageID.1667.) To that end, the trial court found numerous inconsistencies between the evidence of the first shooting presented at trial and the details Barber had provided. For one, the video evidence and testimony "clearly shows that there was no break-in or attempted break-in at or near the time of the shooting," contrary to what Barber said. (*Id.* at PageID.1670.) Instead, all the evidence pointed to a drive-by shooting. Barber also claimed he was stabbed as a result of his break-in, but there was no evidence of a stabbing in the case, and medical personnel later confirmed that there was no evidence of a stab wound on Barber either. (*Id.* at PageID.1671.) Thus, the trial court found that not only did Barber's description of the crime not match with the evidence before it, but his credibility was in question because he had no stab wound. (*Id.*) Further, Colson, who was the victim of the first shooting, did not appear to be of

Chaldean descent. (*Id.* at PageID.1672.) And finally, the firearm that was tied to the shooting was not recovered in a bush. (*Id.*)

The trial court also stated that Barber provided no details of the crime beyond what someone would know from reading or watching a news story about the shooting. As there was quite a bit of media coverage of the shootings, it was even more likely that Barber had taken the few corroborating details he provided from one of those stories. (ECF No. 11-18, PageID.1673.) The trial court further noted that Barber is a frequent visitor to the hospital and is known to have delusions, as well as to suffer from bipolar disorder and schizophrenia. (*Id.* at PageID.1673–1674.) So, the court concluded, there were not corroborating circumstances to allow the confession to be admitted.

This Court may not review the trial court's exclusion of the confession under state evidentiary law. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). However, if the alleged error is so "fundamentally unfair as to deprive the petitioner of due process," it is cognizable on habeas review. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). The right to present a defense is a "fundamental" element of due process. *Washington v. Texas*, 388 U.S. 14, 19 (1967). But this right is not unlimited. Indeed, a defendant does not have a due-process right to "offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).

The trial court's exclusion of Barber's statement did not amount to a due process violation. The trial court's reasoned exclusion of the statement boils down to finding that the statement was unreliable and could potentially confuse the issues. The confession only marginally tracked the crime at issue and was replete with indications that it was not a credible confession to the shooting. In other words, contrary to Thomas' argument, it was not just the fact that Barber struggled with his mental health that warranted exclusion of the confession. And more fundamentally, Thomas was not deprived of his right to present a defense. In fact, similar to what he has argued in his petition, he presented a defense to the jury that focused on the lack of direct evidence in the case and the fact that multiple people were connected to the evidence, not just Thomas. (ECF No. 11-19, PageID.1724–1738.)

So the Court finds that the state court did not unreasonably apply federal law to exclude Barber's confession.

### E. Unconstitutional Search of Cellphones

Thomas asserts that the evidence from the cellphones was illegally obtained because officers lacked probable cause to obtain the warrant they used to seize the phones. The trial court rejected this claim on the merits, finding that the Special Agent who executed the affidavit in support of the search warrant sufficiently set forth facts to establish probable cause. (ECF No. 17-4, PageID.2833.)

Because the trial court considered Thomas' Fourth Amendment claim on the merits, this Court cannot review its conclusion when considering a habeas petition. *See Stone v. Powell*, 428 U.S. 465, 494–95 (1976) ("[W]e conclude that where the State

31

has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). Federal courts are limited in their review of Fourth-Amendment claims in this way because exclusion under the Fourth Amendment is a "deterrent prescribed by the courts, not a personal right guaranteed by the Constitution," and the deterrence "produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great." *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2013) (citing *Stone*, 428 U.S. at 493). The Sixth Circuit has clarified that an "opportunity for full and fair consideration" under *Stone* "means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good*, 729 F.3d at 639.

Michigan has a procedural mechanism which presents "an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim"—a motion to suppress. *See Robinson v. Jackson*, 366 F. Supp. 2d 524, 527 (E.D. Mich. 2005).

And Thomas had a full and fair opportunity to raise his Fourth Amendment claim in that way. The procedure was available, and Thomas does not argue that the State prevented him from filing a motion to suppress while he was being tried. *See Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) ("Because Machacek concedes that Michigan has a procedural mechanism which presents an adequate opportunity to raise his Fourth Amendment claims, he must establish that a failure of that procedural mechanism somehow prevented him from litigating his claims.").

Thomas does mention that his trial counsel's failure to move to suppress was ineffective. But that is not a failure with the procedural mechanism itself—instead, that is possible failure by his trial counsel. *See Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012) (finding that the trial court's rejection of Fourth Amendment claims "because [petitioner's] attorney did not show up at the hearing designed to consider them" still provided Petitioner with "ample" opportunity to present his claims in state court). Further, Thomas was able to present his Fourth Amendment claim to the trial court on collateral review, which was denied on the merits.

So the Court will not grant habeas relief on Thomas' Fourth Amendment claim as the State of Michigan provided him with a full and fair opportunity to litigate that claim in state court.

### F. Ineffective Assistance of Trial Counsel

### 1. Failure to Raise Prosecutorial Misconduct

In addition to his direct claim that there was prosecutorial misconduct during his trial, Thomas also asserts that his trial counsel was constitutionally ineffective for failing to raise the issue.

To succeed on this claim, Thomas must show prejudice, or "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). But because the Court has already found that his prosecutorial-misconduct claims are without merit, Thomas cannot show prejudice. In other words, a meritless claim cannot have changed the results of the proceedings. *See Mahdi v. Bagley*, 522 F.3d

631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

So the Court will not grant relief on his ineffective-assistance-of-counsel claim either.

### 2. Failure to Raise Jury Oath Error

Thomas has one other exhausted claim regarding trial counsel's constitutionally deficient performance—that she did not object to the trial court administering the wrong oath before voir dire and failed to move for a new trial. (ECF No. 13, PageID.2125.) The trial court gave the jury the wrong oath before voir dire, resulting in the jury not being asked: "Do you solemnly swear or affirm that you will truthfully and completely answer all the questions you will be asked about your qualifications to serve as jurors in this case?" (ECF No. 11-14, PageID.752.) Thomas argues that this deprived him of a fair and impartial jury.

*Strickland* requires that Thomas show both that counsel performed deficiently and, had she not performed deficiently, that the result of his proceedings would have been different. 466 U.S. at 687. But he cannot show either.

For starters, Thomas states that "counsel's failure to immediately object and request that the jurors be properly sworn could not be considered reasonable trial strategy." (ECF No. 13, PageID.2129–2130.) Perhaps true, but the record shows that trial counsel asked for a mistrial after the trial court informed the parties of the oath error, which was denied by the trial court. (*See* ECF No. 11-14, PageID.753.) Thomas also contends that counsel should have accepted the trial court's offer to restart or

continue jury selection. (ECF No. 13, PageID.2147.) This was not necessarily unreasonable, however. The trial court issued the correct oath to the 13 seated jurors, and trial counsel indicated that they had already seated the jury "based on the composition of people that you have in front of you[.]" (ECF No. 11-14, PageID.791–792, 795–796.) So it is possible that counsel reasoned that any issue from the improper oath was insignificant or corrected, and that Thomas would not be able to select a more favorable jury if they started over. Given the "highly deferential" review this Court must employ when judging an attorney's performance, *Strickland*, 466 U.S. at 689, and that trial counsel cured her failure to object as soon as she realized what had happened, the Court does not find that trial counsel performed in a constitutionally deficient manner.

But even if she had, Thomas cannot show prejudice. It appears that Thomas believes he was prejudiced by this failure to object because "there is a real likelihood that the failure to swear the jurors to completely and truthfully answer jury selection questions actually affected the fairness and integrity" of Thomas' trial. (ECF No. 13, PageID.2129.) But as the trial court explained in its order on Thomas' motion for relief from judgment, "[t]he Court then took corrective action to remedy the error by instructing the prospective jurors and issuing a corrective oath[.]" (ECF No. 17-4, PageID.2830; ECF No. 11-14, PageID.759.) The trial court also stated that it would ask the not-yet-empaneled jury members if they believed they had answered "falsely or dishonestly or incompletely," and based on their answers, it would "reopen" voir dire. (ECF No. 11-14, PageID.759.) And the record shows the trial court did in fact

take these steps. (ECF No. 11-14, PageID.795–797 (readministering correct oath, asking attorneys for challenges for cause, asking if attorneys have additional questions, and asking for peremptory challenges).) So the Court finds it difficult to conclude that the jury was unfair or impartial given the curative steps the trial court took before the jury was empaneled. And Thomas does not point to anything indicating that any juror answered falsely, dishonestly, or incompletely or did not decide the case based on the facts presented. *See Williams v. Bagley*, 380 F.3d 932, 945 (2004) ("Generally, a defendant's right to an impartial jury is secured if a juror attests that he can set aside any information that he has obtained and render a verdict based on the evidence presented in court[.]" (citing *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961))). And if the jury was not unfair or impartial, then it is not reasonably likely the outcome of Thomas' proceedings would have been different.

Thomas argues that the oath error may have caused jurors to fail to disclose facts that would have supported a challenge for cause. In support, he states that one juror, Juror #10, raised issues he faced with his finances and family after voir dire had concluded. Based on those issues, Juror #10 stated he would have trouble focusing on the case. So, Thomas' argument goes, if one juror raised issues after jury selection had concluded, others could have similar issues and not disclosed them because they did not receive the correct oath before voir dire.

There are a few issues with this argument. For one, Juror #10 raised the issues he had with focusing on the case *before* the trial court issued its corrective instruction and oath. (*See* ECF No. 11-14, PageID.759.) So it seems even more likely that after

the trial court directly asked the jurors whether they had been truthful during voir dire, more jurors would come forward if they had any issues. And since Juror #10 came forward despite not receiving the correct oath, it also appears that the error with the oath did not affect the jurors' ability to raise issues before they were empaneled. Further, the Court agrees that the issue Juror #10 raised—that he was distracted because of his family's financial issues—was not indicative that he was dishonest during voir dire. So Thomas' argument does not go so far as to show that he would have been entitled to a different jury, or that he would have been entitled to remove any more jurors for cause, but for counsel's errors.

In sum, the Court finds that trial counsel's failure to object to the wrong jury oath being administered before voir dire was not deficient performance given the ultimate motion for mistrial that she filed. But even if it was, Thomas has not shown prejudice. So Thomas' ineffective-assistance-of-trial-counsel claim on this basis is denied.

### G. Ineffective Assistance of Appellate Counsel

Lastly, Thomas asserts a claim of ineffective assistance of appellate counsel. In support, Thomas states that appellate counsel only raised two issues on direct appeal when he should have raised all the issues raised in Thomas' habeas petition. (ECF No. 13, PageID.2153–2154.)

To the extent the Court already found those issues to be without merit, appellate counsel was not deficient for failing to raise them. *See Mahdi v. Bagley*, 522

F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

For the issues there were not addressed on the merits because they were procedurally defaulted, the ineffective-assistance-of-appellate-counsel claims based on those issues suffer the same fate. (*See* ECF No. 17-3, PageID.2803 (raising ineffective appellate counsel claim in motion for relief from judgment "[b]ased on the issues raised in this Motion," which did not include all issues raised in amended petition); ECF No. 17-7, PageID.3100.) So the Court will not address those claims on the merits.

Thus, Thomas' ineffective-assistance-of-appellate-counsel claim is denied.

## IV.

In sum, Thomas' petition for a writ of habeas corpus is DENIED. A separate order on the certificate of appealability and a separate judgment will follow.

SO ORDERED.

Dated: March 27, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE